**IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
AT JACKSON**

_____

|  |  |  |
|---|---|---|
| **MOZELLA WRIGHT and**, | ) | Fayette County Circuit Court |
| **CLEVIN WRIGHT**, | ) | No. 3579 |
|  | ) |  |
| Plaintiffs/Appellants. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9609-CV-00213 |
|  | ) |  |
| **CITY OF ROSSVILLE, TENNESSEE** | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |
| **And** | ) |  |
|  | ) |  |
| **JOHN BEASLEY**, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

# FILED

**October 22, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Fayette County at Somerville.
**Honorable Jon Kerry Blackwood, Judge**

**Lanier Fogg**, Memphis, Tennessee
Attorney for Plaintiffs/Appellants.

**Charles A. Sevier**, SEVIER & PHILLIPS, P.C., Memphis, Tennessee
Attorney for Defendant/Appellee City of Rossville, Tennessee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Mozella Wright appeals from the judgment of the trial court dismissing her cause of action for personal injuries sustained in an automobile accident against the City of Rossville ("City" or "Appellee").[1]  It is alleged that Mrs. Wright's injuries resulted from the negligence of John Beasley, Jr., a sergeant with the Rossville Police Department.[2]  The trial court dismissed the complaint upon finding Mrs. Wright 50% or more negligent after a bench trial.  For reasons expressed below, we affirm.

The following facts are not in dispute: At approximately 9:30 p.m. on April 19, 1994, Mrs. Wright was traveling in an easterly direction on Highway 57 to her home.  A vehicle driven by Ms. Mulligan with passenger, Kathleen Graham, followed a few car lengths behind.  Sometime prior, a vehicle driven by Michael Willis with passengers, Jason Cox and Matthew Howard, had been involved in a one car accident on Highway 57 when their vehicle went off the road into a ravine.  The three removed their disabled vehicle from the ravine and repositioned it on the southern side of and off the highway.  After receiving a call from a passing motorist concerning this accident, Sergeant Beasley traveled west on Highway 57, observed the disabled vehicle, proceeded down the highway, turned around and then traveled easterly to park his squad car behind the Willis vehicle, somewhat overlapping it so that his driver's side tires rested on the east bound edge of the pavement of Highway 57.  As Mrs. Wright approached the two parked vehicles to her right she crossed the centerline of the two lane highway to collide head on with a vehicle driven in a westerly direction by Ricky Hobson.  Ms. Mulligan's vehicle then made slight impact with the Wright vehicle.  The portion of the highway where the incident occurred is not lit.

The controversy in this matter, quite obviously, concerns the cause or causes for Mrs. Wright's vehicle to cross the centerline and collide head on with Mr. Hobson.  Appellants contend that the accident occurred due to the negligence of Sergeant Beasley in parking his vehicle partially on the road, causing an obstruction; failing to turn his flashing blue lights on prior to the incident; and opening his car door into Mrs. Wright's path as she approached.  Although Mrs. Wright has no

_____

[1]Mrs. Wright's husband, Clevin Wright, filed a derivative claim and both are appellants in this appeal.

[2]Suit as to Sergeant Beasley, individually, was dismissed by the trial court, upon motion, pursuant to the Tennessee Governmental Tort Liability Act.

independent recollection of the incident other than remembering "the car on the left" and then "everything went blank," Appellants rely on the testimonies of various other eyewitnesses.

The following testimonies were presented regarding the disputed facts of this case: Mr. Hobson testified that as he traveled west down Highway 57, he observed two parked vehicles to his left. The vehicle in the rear had its headlights on, but he observed no flashing blue lights prior to the incident. Mrs. Wright's vehicle crossed over into his lane "a little more than a foot." On cross-examination, Hobson was questioned regarding a prior statement he made to an investigator that he observed blue lights flashing prior to the accident.

Ms. Graham testified that she and Ms. Mulligan[3] traveled behind the Wright vehicle "for some time," during which she observed Mrs. Wright traveling in a mannerly fashion and at a reasonable rate of speed. She observed no blue lights prior to the time of impact. Prior to the accident, she saw a car "[s]ome distance up ahead" make a u-turn. On cross-examination, she explained that after the u-turn, the car pulled over to the side of the road and she realized it was a police car at about the time the accident occurred. When asked whether she noticed any reason for the Wright vehicle to veer over the centerline, she stated, "[w]e could not see because of her [sic] car was blocking what was going on on the side of the road."

Jason Cox testified that on the night of the incident, he and his friends were traveling from Memphis to their home in Alabama. He was asleep in the backseat when their vehicle went off the road into a ditch. He and his friends then "pushed" the car over to the other side. He was standing at the trunk of his car when Sergeant Beasley made a u-turn in the road and pulled up behind it. Cox observed no flashing blue lights at the time, only headlights. Cox stated that after positioning his police car behind the vehicle, Sergeant Beasley "stepped out of the car and started to make his way over to us when the accident happened." He continued, "[Beasley] didn't really go past the door when a car came by and swerved around his and hit another car in oncoming traffic." When asked if Beasley had "cleared the door" of his vehicle at the time of impact, Cox replied, "[h]e hadn't made it to the front of the car, no." According to Cox, the driver's side wheels of the squad

---

[3]Ms. Mulligan was deceased at the time of trial.

car were "about a foot or so on the road." Cox testified that he and his friends had not been drinking that evening and no attempts were made to arrest them.

Matthew Howard testified that after the accident involving his vehicle, he and his friends "got out and surveyed the damage" and then he "drove the car up onto the other side of the road." When Sergeant Beasley initially pulled in behind the car, his flashing blue lights were not on, only headlights. Howard first realized that the vehicle was a police car "[w]hen he pulled in close enough to where [he] could see the outline of the lights on the top." Beasley then attempted to get out of his car and the interior light came on as he opened the door. Howard described the accident, stating: "[o]ut of the corner of my eye, coming the other way, I saw a vehicle approaching, and when the car came it swerved to avoid the door that was already opened on the side of the road, and then the wreck happened." On cross-examination, Howard admitted making an earlier statement to an investigator that the officer's blue lights were flashing. By way of explanation, Howard maintained that the "whole time frame" for the incident "wasn't long at all" and that seemingly within seconds afterwards, numerous blue lights were flashing. He stated that he was never specifically questioned about any time frame and that "the way [he] answered the question was that [Beasley] eventually did turn his blue lights on."[4]

Sergeant Beasley testified that as he traveled west on Highway 57, he observed a parked vehicle on the south side of the highway. He proceeded past, turned left into a dead-end road, turned around toward Highway 57 and stopped before proceeding onto the highway to travel east bound. He then pulled behind the parked vehicle and activated his blue lights as well as his "take down" lights, which he described as "two very bright lights directly to the front of the squad car . . . for the purpose of illuminating anything on the front of the squad car for the officer's safety on traffic stops." Beasley explained that he positioned his driver's side tires on the edge of the pavement because the disabled vehicle "was sitting in such close proximity to the highway it was creating a danger in [his] mind to oncoming motorists." His positioning of his vehicle in such manner so as to overlap the disabled vehicle was in accordance with his police training. Beasley stated that the take down lights are "dominant" to the blue flashing lights and "more noticeable" to

_____

[4]From the record it appears that the investigator's questions were posed in sequence of events.

oncoming traffic to the front of the vehicle than the rear. If approaching from the front, the take down lights "would be the first thing you're likely to see." After activating his lights, Beasley contacted the dispatcher to relate his findings. He manually turned on the overhead dome light in his car to write down the time for reporting purposes. He explained that the dome lights on a police car are deactivated prior to their actual use by the department so that they do not come on when the door is opened for the officer's safety. Therefore, the light must be manually operated. As he wrote, he heard a crash and felt debris come into his driver's side window. After impacting with the Wright vehicle, the Mulligan car came to rest next to the officer's door and he was unable to exit until he motioned for the driver to back up.

On cross-examination, Beasley testified that the actual impact occurred when he was looking in his rear view mirror waiting for acknowledgment from the dispatcher. He has "no idea" what caused Mrs. Wright to cross the centerline. He admitted preparing a complaint report after the accident wherein he indicates that the incident occurred just after he started to exit his vehicle. He explained that there are "a lot of things leading up to my getting out of my vehicle in preparation to exit," including listening to radio transmissions. He has "to do everything before actually getting out so that it's done properly." Beasley agreed that if his door had been open, it would have created a hazardous condition for a driver traveling in the east lane.

Jerry Priddy, a lieutenant with the Jackson Police Department, testified that Beasley's positioning of his patrol car was proper "for the conditions out there that night" and in accordance with the standards of police accident investigation. He explained that such overlapping of the other vehicle provides an area of safety for the police officer and that standing between the two vehicles could prove dangerous if the police car was subsequently rear-ended causing it to collide with the other vehicle, pinning the officer and possibly others between the two. On cross-examination, Priddy confirmed that he considered Beasley's positioning of his vehicle proper from the perspective of protecting the scene, the officer and the young men. He was asked, ". . . you didn't base it on protecting those people . . . using the highway, did you?", to which he replied, "[t]hat goes into it because if there's a hazard in the highway and you don't block it, you're just as liable as if you had blocked the road." Priddy agreed, however, that under the present circumstances no hazard was in the highway because the disabled vehicle was positioned off the road.

Tennessee State Trooper Russell Garrington conducted an on-scene investigation of the accident. He interviewed Hobson, Mrs. Wright and Beasley. He does not remember questioning the three men from Alabama. According to Garrington, Mrs. Wright told him that she crossed the centerline to avoid the police car stopped on the south edge of the highway. She also informed him that emergency lights were flashing on the patrol car. She made no comment regarding the door on the police car. On cross-examination, Garrington stated that Mrs. Wright was extracted from her vehicle with the "jaws of life." He observed her in the vehicle with blood on her face complaining of pain. He interviewed her after she was removed and had been placed on a stretcher at the back of the ambulance. He described her as "dazed" at the time. Before speaking with Mrs. Wright, Garrington briefly discussed the accident with Beasley who informed him of the general location of his squad car at the time of the accident and that he had activated his blue lights. Trooper Garrington admitted that he made no effort to determine from other witnesses the exact location of the patrol car at the time of accident, even though Mrs. Wright indicated that the car was the reason she crossed the centerline. Garrington's report depicts the Mulligan vehicle as also crossing the centerline; however, no reason is indicated.

Based on the foregoing, the trial court made the following findings of fact:

1. That Officer Beasley parked his vehicle on the south edge of Highway 57, slightly overlapping the disabled vehicle.

2. Prior to parking his vehicle, Officer Beasley activated his emergency blue lights, as well as his take down lights.

3. In positioning his vehicle and activating his lights; Officer Beasley was following standard police procedure.

4. Officer Beasley did not open his door into the eastbound lane of traffic immediately prior to the accident.

5. As plaintiff approached the two vehicles parked on the south side of the road, she veered her car across the center line, striking the [Hobson] vehicle.

6. By such action, plaintiff was negligent.

7. Plaintiff's negligence in crossing over the center line was 50% or more of the total negligence involved, and, therefore, recovery is barred.

Appellants identify the issues on appeal as follows:

I. The evidence preponderates against the findings of the trial judge.

II. In evaluating a witnesses' testimony, he trial court erred in relying on evidence that was inadmissible.

III. The trial court used the wrong standard in determining whether Officer Beasley was negligent.

Our review of the trial court's findings of fact in a nonjury trial is *de novo* upon the record, accompanied by a presumption of correctness. Unless the evidence preponderates against those findings, we must affirm, absent error of law. Rule 13(d) T.R.C.P.; *e.g., Edwin B. Raskin Co. v. Doric Bldg. Co.*, 821 S.W.2d 948, 950 (Tenn. App. 1991); *Hackett v. Smith County*, 807 S.W.2d 695, 699 (Tenn. App. 1990). No presumption attaches to conclusions of law. *Richardson v. Tennessee Assessment Appeals Comm'n*, 828 S.W.2d 403, 407 (Tenn. App. 1991).

The record establishes that four disinterested witnesses in this case (Hobson, Graham, Cox and Howard) testified that Sergeant Beasley had not activated his blue lights prior to the accident at issue here. Two of these witnesses (Cox and Howard) stated that Beasley had opened the door on his patrol car just prior to impact. Sergeant Beasley's testimony is to the contrary. The trial court chose to accredit the testimony of the latter. In so doing, the trial judge discredited the testimony of Mr. Hobson, noting his previous statement to an investigator that he remembered seeing blue lights. Appellants contend that the trial court erred in considering Hobson's prior statement as an exhibit because it was unsigned and never authenticated, rendering it inadmissible. The record reflects that Hobson's statement was marked for identification purposes only. Hobson's testimony indicates his acknowledgment of making a statement to the investigator. He, however, could not recall his specific answer to the question regarding the patrolman's car lights. Clearly, the statement was offered to impeach the trial testimony of Hobson. We find no error in the trial court's consideration of the inconsistency between Hobson's prior statement and his testimony at trial.

As to the testimonies of Cox and Howard, the trial court found the young men's differing versions as to how they transported their disabled vehicle to the other side of the road after their own accident (Cox stated that the vehicle was "pushed" to the other side and Howard stated that he "drove" it) significant. This discrepancy in their testimonies caused the trial court to conclude

that "one of [their] memories was faulty, or their degree of attention . . . was focused more on their plight, rather than the impending collision." The court also noted the discrepancy in the testimonies of Howard and Beasley regarding the dome light in Beasley's squad car. The court states:

> Mr. Howard quite emphatically stated that just prior to the accident he saw the dome light of the squad car illuminate. Afterwards, Officer Beasley opened the door, and the collision occurred. Mr. Cox had testified that Beasley had gotten out of the vehicle and was coming toward the young men. Officer Beasley's uncontradicted testimony, however, is that once the door of his squad car is open, the dome light is deactivated. Therefore, for the dome light to be on, Officer Beasley's door would have to be shut.

We do not find this finding by the trial court consistent with the testimonies of the witnesses. True, Officer Beasley testified that the dome light on the patrol car was deactivated prior to use so that when the door is open the light does not come on. However, it was his testimony that he turned the light on himself "manually" prior to the time of impact. There is no indication from this record that opening the squad car door would turn the dome light off if, in fact, it had been activated manually. The court also called Howard's credibility into question on the basis of his inconsistent statements regarding whether Beasley's blue lights were flashing prior to the accident. The court specifically found Howard's attempted explanation of the inconsistency "implausible" considering his "manner and demeanor."

Ms. Graham's testimony that she saw no flashing blue lights prior to the accident was also questioned by the trial court, stating that "her attention could have been focused more directly toward the impending collision tha[n] a close scrutiny of the officer's vehicle." Ms. Graham offered no testimony regarding the position of the police officer's door at the time of impact.

On the other hand, the court found Officer Beasley's testimony regarding the incident "direct and unequivocal." We question the trial court's finding in this regard only with respect to the officer's somewhat less than consistent statement in his "accident report" that the incident occurred just after he started to exit his vehicle. In any event, it is clear from the record that the trial court recognized the significance of its duty in assessing the credibility of the witnesses and the weight to be given their respective testimonies. The court states:

>  In evaluating these assessments, the Court has considered the manner and demeanor of all the witnesses, as well as their ability to recollect and their attitude toward their testimony.  In reaching the Court's determination on these issues, the Court has considered certain points in the testimony of each witness that the Court deems salient in assessing the weight each witnesses' testimony should be afforded.

It is well established that this Court on review is to afford considerable deference to the trial judge in those circumstances where issues of credibility and weight of oral testimony are involved.  *Tenn-Tex Properties v. Brownell-Electro*, 778 S.W.2d 423, 425 (Tenn. 1989).  Where the issue for decision depends on the determination of the credibility of the witnesses, the trial court is the best judge of the credibility and its findings in this regard are entitled to great weight.  This is true because the trial court alone has the opportunity to observe the appearance and demeanor of the witnesses.  *Tenn-Tex Properties*, 778 S.W.2d at 426.  The trial court will not be reversed on issues which hinge on the witnesses' credibility unless the record contains clear, concrete and convincing evidence other than oral testimony which contradicts the trial court's findings.  *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. App. 1990).  As no such evidence exists in this record, we conclude that a preponderance of the evidence supports the findings of the trial court.

As to the final issue, Appellants argue that the standard of care applied by the trial court was whether the officer acted in accordance with standard police procedure rather than the appropriate standard of reasonable care.  We hold that the trial court's finding that Sergeant Beasley followed proper police procedure with regard to the accident does not suggest a misapplication of the law of comparative fault.  The trial court found that Sergeant Beasley's blue lights were flashing prior to the accident and that he did not open his door as the Wright vehicle approached.  Therefore, even assuming that the officer's positioning of his vehicle on the edge of the road was negligent does not necessarily alter the trial court's finding that Mrs. Wright was 50% or more negligent.

Accordingly, the judgment of the trial court is affirmed and this cause remanded for any further necessary proceedings.  Costs are assessed against the appellants, for which execution may issue if necessary.

_____
FARMER, J.

_____

CRAWFORD, P.J., W.S. (Concurs)


_____

HIGHERS, J. (Concurs)